VIDAL & CO., LTD., PLAINTIFFS AND APPELLEES, v. AMERICAN RAILROAD COMPANY, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Ponce in an Action for Damages.

No. 1920.—Decided March 26, 1920.

TRANSPORTATION OF MERCHANDISE—RAILROAD—LIABILITY OF CARRIER.—Article 145 of the Regulations for the Application of the Police Law of Railroads is not applicable to a case where the merchandise delivered for transportation, the value of which is sued for, has been destroyed by fire.

ID.—ID.—ID.—VIS MAJOR—NEGLIGENCE—FIRE.—In accordance with articles 361, 362 and 363 of the Code of Commerce, carriers are liable for the loss of or damage to merchandise delivered to them for railroad transportation, unless they prove that the loss or damage was due to accident, vis major, or to the nature and defectiveness of the merchandise, but the shipper may prove, however, that the causes occurred as a result of the negligence of the carrier or of his failure to take such precautions as a diligent person usually takes; and, according to article 139 of the Regulations of the Police Law of Railroads, in cases of fire the carrier must prove that it was not due to the carelessness or negligence of its employees or to the insufficiency or bad condition of the means of transportation.

ID.—VIS MAJOR—FORTUITOUS EVENT.—Vis major, or fortuitous event, is an unexpected accident which could not have been foreseen or prevented.

ID.—ID.—ID.—FIRE.—Although a fire may be considered a fortuitous event or vis major only fires which could not have been foreseen or prevented have that character. The burning of merchandise delivered to a carrier for transportation by a fire of unknown origin cannot be considered as vis major or a fortuitous event, because it can not be determined whether or not it could have been foreseen or prevented.

ID.—DAMAGES—PLEADING.—In a suit for the loss of or damage to merchandise delivered for transportation it is not necessary to allege that the loss or damage was due to the negligence of the carrier, but only that the merchandise was received and not delivered, or delivered damaged, alleging also its value in order to show a right to recover the amount.

ID.—REGULATIONS OF POLICE LAW OF RAILROADS.—Articles 138 and 139 of the Regulations for the Application of the Police Law of Railroads of February 1888 are still in force, for they do not conflict with American institutions and have not been repealed by any law.

ID.—ID.—EXECUTIVE COUNCIL.—The Foraker Act did not empower the extinct Executive Council of Porto Rico to determine and regulate the liability of carriers for the loss of or damage to merchandise received by them for transportation; therefore article 139 of the Regulations for the Application of the Police Law of Railroads could not be repealed by section 16 of the Regulations approved by the extinct Executive Council of Porto Rico on May 7, 1907.

The facts are stated in the opinion.

*Messrs. G. H. Moscoso, F. G. Pérez Almiroty* and *E. Acuña* for the appellant.

*Mr. J. Tous Soto* for the appellees.

MR. JUSTICE ALDREY delivered the opinion of the court.

In the early morning of August 31, 1916, a fire occurred in a warehouse used by the American Railroad Company of Porto Rico in the city of Ponce in connection with its business of carrying passengers and freight by railroad. Several cars were standing on the tracks near the warehouse and between it and the station and the fire reached and destroyed three of them containing merchandise belonging to The Porto Rico Drug Company, Homar, Colón & Co., Ltd., and Vidal & Co., Ltd., who brought suits against the American Railroad Company of Porto Rico to recover the value of said merchandise, alleging that due to the defendant's negligence the warehouse had burned and the fire had been communicated to the cars loaded with their merchandise. Judgment was rendered in each of the three actions against the defendant for a certain sum of money and in each case the party aggrieved by the judgment appealed. The appeals were heard together in this court, having been so tried in the lower court.

In a single opinion for the three cases the trial court held that each and all of the facts alleged in the complaint material to constitute the cause of action had been proved, adding that the opinion was based on article 11 of the regulations and rates of the defendant company; on article 145 of the Police Law of Railroads, held to be in force; on articles 361, 362 and 363 of the Code of Commerce; on articles 138 and 139 of the Regulations for the Application of the Police Law of Railroads, and very especially on the judgment of the Supreme Court of Spain of October 7, 1899. The appellant now assigns the following as errors committed in rendering the judgments:

1st. Error of law in applying to an action for the recovery

of the value of merchandise destroyed by fire article 145 of the Regulations of the Police Law of Railroads, which refers limitedly and definitely to the disappearance and deterioration of goods delivered for transportation, whether the damage is due to acts of the employees of the company or of strangers who may come to its offices.

2nd. Error of law in considering now in force and applying to this case provisions of the Regulations of the Police Law of Railroads which have been repealed.

3rd. Error of law in not applying to the case the regulations and rates for the transportation of passengers, freight and mail by the American Railroad Company of Porto Rico, approved by the Executive Council on May 5, 1907, article 16 of which exempts it from liability for all damages caused by fire.

4th. Error of law in violating a stipulation of the contract which exempts the company from liability for damages due to unforeseen or unavoidable accidents, this stipulation having been expressly accepted by the plaintiffs among the various stipulations printed on the back of each bill of lading signed by them.

5th. Error of law in holding the company liable because of the absence from the bills of lading of the letters O. R. or the phrase "at the owner's risk" required by rule 11 of the freight classification, when the fact is that the letters and phrase are required of shippers who are allowed a reduction in the rates.

6th. Error of law in applying to this case the doctrine laid down in the judgment of the Supreme Court of Spain of October 7, 1899, under laws which are not in force in this Island.

7th. Error of fact in finding from the evidence that the fire of August, 1916, which was the immediate cause of the damages sued for, was due to the negligence of the company.

8th. Error of fact in finding that on account of the negligence of the defendant the fire spread from the warehouse where it originated to the cars containing the merchandise destroyed.

Although the trial court cites article 145 of the Police Law of Railroads, this was undoubtedly a mistake, for that law contains no such article and evidently the court refers to article 145 of the Regulations for the Application of the Police Law of Railroads.

In the first assignment of error the appellant only maintains that article 145 cited by the court (an article of the regulations) has no relation to cases of destruction by fire, but refers to cases of liability for the disappearance or deterioration of merchandise.

Said article 145 (Comp. Stat. and Codes, 1911, section 9034) reads as follows:

"Article 145.—The companies shall always be liable for the *loss and damage* [disappearance and deterioration] of articles intrusted to their care, whether the damage is due to acts of the employees themselves or of strangers who may frequent the offices."

The article cited is not applicable to this case in which the merchandise whose value is sued for was destroyed by fire, for it refers to cases of disappearance and that word carries with it the idea of loss by theft or robbery and is distinct from the idea of destruction by fire. There are other provisions in the same regulations for cases such as the one at bar.

The Code of Commerce of 1885, in treating of mercantile contracts for transportation by land, provides in article 355 that the liability of the carrier shall begin from the moment he receives the merchandise, and we find the same provision in article 114 of the Regulations for the Application of the Police Law of Railroads, promulgated in 1888, Comp. Stat.

and Codes, 1911, p. 1336; and with respect to such liability the Code of Commerce provides as follows:

· "Article 361.—Merchandise shall be transported at the risk of the shipper, unless the contrary was expressly stipulated.

"Therefore all damages and impairment suffered by the goods in transportation, by reason of accident, *force majeure,* or by virtue of the nature or defect of the articles, shall be for the account and risk of the shipper.

"The proof of these accidents is incumbent on the carrier.

"Article 362.—The carrier, however, shall be liable for the losses and damages arising from the causes mentioned in the foregoing article if it is proved that they occurred on account of his negligence or because he did not take the precautions usually adopted by careful persons, unless the shipper committed fraud in the bill of lading, stating that the goods were of a class or quality different from what they really were.  *  *  *

"Article 363.—With the exception of the cases *prescribed* [described] in the second paragraph of article 361, the carrier shall be obliged to deliver the goods transported in the same condition in which, according to the bill of lading, they were at the time of their receipt, without any detriment or impairment, and should he not do so, he shall be obliged to pay the value of the goods not delivered at the point where they should have been and at the time the delivery should have taken place.  *  *  * "

It will be seen from these statutes that although they apparently establish the rule that in the absence of a contrary agreement the shipper assumes the risk of transportation, nevertheless they actually provide to the contrary, that is, that the carrier is liable for the loss of or damage to the merchandise delivered to him for transportation unless he proves that the destruction or damage was due to a fortuitous event, *vis major,* or the nature and defectiveness of the goods, and even then he is still liable if the shipper proves that the loss or damage was due to the negligence of the carrier or to his failure to take such precautions as a diligent person usually takes. Therefore, in accordance with these statutes, it is sufficient that the goods were delivered

for transportation to make the carrier liable for their loss or damage, unless he prove that the loss or damage was due to some of the causes which exempt him from responsibility.

Although a fire may be considered a fortuitous event or *vis major,* yet all fires have not that character, but only those which could not have been foreseen or prevented. According to Escriche's *Diccionario de Legislación,* "*vis major* is an occurrence which could not have been foreseen or prevented, as lightning, hailstorm, flood, hurricane, invasion by enemies, assault by robbers. '*Vis major est,*' says Cayo, '*ea quae consilio humano neque provideri neque vitari potest.*' And a fortuitous event is an unexpected accident or *vis major* which could not have been foreseen or prevented. Law 11, Title 33, 7th *Partida.* Examples of these are floods, torrents, shipwrecks, fires, lightning, violence, insurrections, destruction of buildings by some unforeseen misfortune, and other similar happenings." All fires are not fortuitous events, said the Supreme Court of Spain in its judgment of October 7, 1899; therefore the burning of merchandise delivered to a carrier for transportation by a fire of unknown origin can not be considered as *vis major* or a fortuitous event, because it can not be determined whether or not it could have been foreseen or prevented.

The said railroad regulations contain the following provisions:

"Article 138.—The burden of proving cases of *force majeure* is on the company and unless it furnish such proof the company shall be liable.

"Article 139.—Robbery shall not be considered a *force majeure* unless the company prove that it did everything in its power to prevent it; nor fire, unless it prove that it was not due to the negligence or carelessness of its employees, nor to the insufficiency or bad condition of the means of transportation."

A comparison of these regulations with the provisions of the code cited shows that both article 138 and article 362

establish the rule that the burden of proof in cases of *vis major* is on the carrier, and that article 139 explains that fire shall not be considered as *vis major* unless the carrier proves that it was not due to his negligence or carelessness; thus changing the rule of article 362 according to which if the carrier proves a fortuitous event or *vis major* he is released from liability unless the shipper proves that the accident was due to the carrier's negligence or carelessness. Therefore, in accordance with the said regulations, which were enacted later than the code, in case of fire it is not sufficient for the carrier to prove that it was due to *vis major*, but he must prove also that it was not due to the carelessness or negligence of his employees, nor to the insufficiency or bad condition of the means of transportation. Consequently, under the Code of Commerce and the said regulations, the first thing that the carrier must prove in order to be exempt from liability is that the fire was due to a fortuitous event or *vis major*.

As a consequence of what we have said and inasmuch as the carrier's liability does not arise from the provisions of the Civil Code relative to fault and negligence, but from the Code of Commerce and the said regulations, which make him liable for merchandise delivered to him for transportation unless he proves a fortuitous event, *vis major* or the defective nature of the merchandise in a suit to recover for the loss of or damage to the merchandise, it is not necessary to allege that the loss or damage was due to the negligence of the carrier, but only the value of the merchandise and that it was shipped and not delivered, or delivered damaged, in order to set up the right to recover its value or the amount of the damage. The action was brought in this form in the case cited from the Supreme Court of Spain, reported in volume 88, page 28, of *Jurisprudencia Civil*.

However, the appellant maintains in the second assignment that articles 138 and 139 of the regulations cited are

not in force because in 1902 the Attorney General of this Island, Hon. James S. Harlan, stated in an opinion that as the police control by the state over railroads is of special importance in that it touches not only the public convenience but the public safety, the said regulations were in force, but subordinate to the power of the Executive Council to grant franchises, privileges and concessions and subject to amendment and limitation by the legislative power; that when the compilation of the revised statutes and codes was made in 1911, in publishing in the appendix the Police Law of Railroads and its Regulations it was stated that they were published for the reason that certain provisions thereof may be still in force, although certain other provisions have been superseded by laws enacted by the Legislative Assembly of Porto Rico, or are inconsistent with certain laws of the United States applicable to Porto Rico; that the United States District Court for Porto Rico held in 1914 in the case of *Robles* v. *American Railroad Company of Porto Rico* that the Police Law of Railroads in force under the sovereignty of Spain is contrary to American institutions; that apart from these precedents and the reasons on which they are founded, it is necessary to hold that such laws have been repealed because the Legislative Assembly of this Island and the Executive Council, in the exercise of the powers conferred upon them by the Foraker Act, have specially and particularly legislated on all matters concerning railroads in the act governing public carriers of 1907, the act governing public service corporations of 1908, the act to regulate transportation by railroad of 1911, and in innumerable ordinances, rules and tariffs, and that all of these acts, which contain enactments different or in conflict with those of the old Police Law of Railroads, conclude with a general repealing clause of all laws or part of laws in conflict therewith.

It is true that many of the provisions of the Law of Railroads and of its regulations are incompatible with our pre-

sent political institutions, but there are many others, such as that referring to the liability of transportation companies for goods entrusted to their care, which present no difficulty in their application, and for that reason Mr. Harlan held the opinion that the law was in force, but subordinate to the powers of the Executive Council to grant franchises, privileges and concessions and subject also to amendment and limitation by the Legislature. As to the citation from the compiler of the Revised Statutes and Codes, it will be seen that he admits that some of the provisions of the law may be in force; and with regard to the *Robles Case,* it was held there that in so far as the old regulations may be applicable they shall be considered as principles governing negligence under the present sovereignty.

As regards the laws mentioned by the appellant as subsequent to and conflicting with the said law and regulations, they contain nothing concerning the liability of railroad companies for failure to deliver merchandise entrusted to them and therefore do not modify or repeal said law and regulations. Hence, articles 138 and 139 of the Regulations for the Application of the Police Law of Railroads, promulgated in February, 1888, and to be found in the Compilation of the Revised Statutes and Codes of 1911 at sections 9027 and 9028, were not repealed by the laws cited by the appellant.

The third error assigned is that the lower court failed to apply section 16 of certain regulations approved by the Executive Council on May 7, 1907, which the appellant offered in evidence and which provides that railroad companies are not liable for the loss of or damage to merchandise in cases of fire, except when it is a result of their negligence. The appellant contends that this rule modifies and repeals article 139 of the Regulations for the Application of the Police Law of Railroads because it does not impose upon the company the obligation to prove that it was not negligent and revives the provision of article 362 of the Code

of Commerce which imposes the burden of such proof upon the shipper, inasmuch as said rule 16 follows the general principle that it is necessary to prove the negligence of the party against whom the claim is made.

The plaintiffs objected to the admission of that rule in evidence, among other reasons, because the Executive Council had no power to legislate upon the liability of the companies, and we think that the appellee was right on this point, inasmuch as the power granted to the Executive Council by section 32 of the Act of the Congress of the United States of April 12, 1900, known as the Foraker Act, to grant franchises, rights, and privileges or concessions of a public or quasi-public nature, did not empower that body to determine and regulate the liability of carriers for the loss of or damage to merchandise, for this power was reserved to the Legislative Assembly; therefore said article 139 could not be amended by the Executive Council so as to revive article 362 of the Code of Commerce.

The fourth assignment of error is that the lower court failed to apply a condition printed on the back of the bill of lading to the effect that the company would not be liable for accidents or delays caused by unforeseen and unavoidable circumstances, the appellant alleging that an unforeseen occurrence is a fortuitous event, an unexpected happening that can not be foreseen or prevented, and one of them is a fire. This is true, but it is also true that that condition is nothing more than a reproduction of the provision of law that carriers are not liable in such cases if they prove the fortuitous event or *vis major;* therefore the question was reduced to whether or not this was proved, as we shall see hereafter.

The fifth error assigned is that the lower court based its judgment on the absence from the bills of lading of the words "at the owner's risk" or the letters "O. R." as required by rule 11 of the regulations for freight classification.

That rule provides that inasmuch as the company is given the right to fix a certain limit of liability for goods received for transportation, provided that they are carried at reduced rates and at the owner's risk as to loss or damage, the shipper assuming all the risks of transportation except in case of the negligence of the company, in order to secure such reduced rates the shipper or his agent must endorse and sign on the voucher or bill of lading, or both, given upon the delivery of goods for shipment, the words "shipped at the owner's risk  *  *  * " which shall release the company from all liability in case of any of the accidents mentioned in the note.

As the shippers in these cases did not sign a note on the bills of lading stating that the shipment was made at the owner's risk, and the letters "O. R." do not appear thereon, it is clear that they did not assume the risks to which that rule refers. Therefore that feature of the contract should have been taken into account because it shows the failure to assume all risks other than those arising from negligence, and that the company is liable without such limitation.

The sixth error assigned is that the lower court improperly applied the doctrine laid down in a judgment of the Supreme Court of Spain of October 7, 1899.

In that judgment the carrier was held liable for merchandise damaged by a fire which took place in the car containing the merchandise, based on article 362 of the Code of Commerce and article 139 of the Regulations for the Application of the Police Law of Railroads. It was held also that all fires are not fortuitous events and that the carrier must prove that the fire was not due to his fault or negligence or to the insufficiency or bad condition of the means of transportation; and the reason of the appellant for contending that that doctrine is not applicable to these cases is that the statutes cited have been modified in this Island.

This ground of error can not be sustained, because, as

we have already said, the liability for the loss of or damage to merchandise imposed by article 362 of the Code of Commerce and article 139 of the said regulations has not been modified by any later law.

As a summary of the questions considered under the foregoing assignments of error, the question of law arising therefrom may be briefly stated as follows: Under our present laws a railroad company is not exempt from liability for the destruction or damage by fire of merchandise delivered to it for transportation unless it proves the cause of the fire so as to show that it was a fortuitous event or *vis major* since it could not be foreseen or prevented, and that the cause of the fire was not due to the negligence or carelessness of its employees or to the insufficiency or bad condition of the means of transportation, and these facts must be established by evidence showing the ordinary care and attention usually exercised by diligent persons on like occasions. *Lehman, Stern & Co.* v. *Morgan's L. & T. R. & SS. Co.,* 70 L. R. A. 564.

We may now examine the last two assignments of error to the effect that the lower court committed errors of fact in holding that the fire occurred through the negligence of the appellant and that due also to such negligence it was communicated to the cars loaded with the merchandise whose value is sued for by the appellees.

Both parties examined oral evidence with regard to the fire, that for the plaintiffs being as follows:

Eleno Torres was the night-watchman at the railroad station of Ponce when the fire occurred and it was his duty to call by telephone at half-hour intervals the train dispatcher of the Mayagüez station. He testified that the company formerly had a night telephone operator, but that at that time there was only a day operator who left at 9 p. m.; that at 2 o'clock that morning he called Mayagüez and after receiving an answer he went out and saw some smoke at the-

rear of the warehouse and went nearer and discovered that it was coming out of the warehouse; that he went around the warehouse and found all the outside doors and the door with the. lock closed; that he immediately went to the telephone and informed the fire department and Mayagüez of the fire, and then proceeded to take out a locomotive in order to save some of the 'cars that were there; that he arrived with the locomotive, but as it is some distance from the station to the roundhouse where the locomotive was, when he returned the fire had increased and the roof of the warehouse was burning; that they coupled the locomotive and took away some cars that were not yet on fire; that the company had given orders that there should be some locomotives under steam during the night and on that night there was one with the regular pressure of steam; that he was not long in returning because immediately upon his arrival he called the watchman of the roundhouse who had not yet noticed the fire, and in the meantime an engineer named Betancourt arrived, who took charge of the machine and brought it out, but as it is somewhat far from the station to the roundhouse, although he went running it took some time, about fifteen minutes, to take the locomotive out and couple the cars; that the station agent was Gelabert and the. freight agent was Rivera; that the witness was alone at the station when he went to the telephone, for. the station was being repaired at that time; that he was discharged two or three days after the fire on the supposition that he caused it.

Darío Suárez, who was the chief of the secret service of Ponce on that night, testified that he had not yet gone to bed and that when he arrived at the place of the fire the warehouse had entirely burned down; that as soon as the alarm was given many people arrived and in spite of all they could do the fire reached to some cars which were near the warehouse; that there was a watchman who was unable to explain; that thereafter the station agent and another

employee arrived; that when he arrived the cars were not yet on fire; that it took the locomotives thirty or thirty-five minutes to arrive and they saved some cars, but others were burned; that when he arrived the fire was confined to the warehouse, the interior of which was entirely on fire; that he does not know the exact time at which he arrived, but knows that the alarm was given at 2:30 or 3 a. m., and he heard it while at the Delicias Square in Ponce; that he went to the place of the fire in a carriage and arrived within two or three minutes; that there were some cars between the warehouse and the station.

Lucas Alvarez was employed by the railroad company in Ponce as telephone operator. He testified that on the day of the fire he was on duty only during the day until 9 p. m. and the other telephone operator had been suppressed; that the night watchman had been ordered to call the Mayagüez dispatcher over the telephone every half hour; that after the last train leaves at 9 p. m. the witness has nothing to do with regard to trains; that the witness had fallen asleep sometimes while doing night duty and the purpose of the watchman's call was that he might not fall asleep; that after he went away at 9 p. m. there were no more trains.

Luis de Jesús, a pharmacist, was at the time the manager of one of the plaintiff firms. He testified that he went to the place of the fire about 2 or 2:30 a. m.; that when he arrived the walls of the warehouse began to fall and some cars were beginning to burn; that some time was lost because it seems that the people were not expert in uncoupling the cars; that the locomotives arrived over half an hour after he got there.

Pedro Shuck, who on that night was the chief of the fire department of Ponce, testified that the fire occurred at about 2 a. m. and he was among the first to get there, the warehouse being then a total loss; that there was a great number of cars, not only near the warehouse, but on other tracks;

that they had much trouble upon arriving at the place of the fire in making the water connections; that they fought the fire in the cars first because the building was already a total loss; that they tried to save the cars; that at the moment of the fire there were no locomotives, for if there had been the cars would have been saved; that when he arrived three cars which stood near the warehouse had already caught fire; that one locomotive took about half an hour to arrive and the other was being fired and he estimates that the first locomotive arrived about an hour after the fire began and half an hour after he arrived at the place; he estimates that the warehouse had been burning for fifteen or twenty minutes when he arrived at the place, because the alarm to the fire department always takes some fifteen minutes and when he arrived at the place of the fire the warehouse was a total loss; that as the fire department has a telephone, as soon as notice of a fire is received they first call him and afterwards the other officers; that two locomotives were brought to lend aid, first one and afterwards the other, but when the locomotive arrived it was useless, as the fire was under control; that on that night there were no locomotives under steam, that some cars weighing thirty-four or thirty-five thousands pounds were hauled out by hand; that each string of cars consisted of six, eight or ten; that there were many cars and he does not know how long they took to call him from the fire department, but they usually call him immediately; he estimates that the fire began half an hour before his arrival; that when he arrived he saw some smoke and there was a mass of flame; that it took him no more than ten minutes to get there; that if there had been a locomotive he would have used it to take away the cars nearest to the warehouse, it not being necessary first to take away other cars because there were switches there; that there were strings of cars like the one nearest to the warehouse that reached almost to the roundhouse and

therefore the cars could have been taken away, thus making the work easier; that three cars near the warehouse were burned, making with those that were charred a total of six or seven, though he does not know the exact number; that there is always a night guard at the fire department who at the alarm of fire takes out the fire engines, makes the necessary water connections and when the firemen arrive returns to the station.

The defendant called the following witnesses:

Juan Rodríguez Cintrón, employed by the company as train dispatcher in Mayagüez, was charged, among other duties, with seeing that the employees of the stations remained at their posts; that the night watchman in Ponce, Eleno Torres, had been instructed to call him every half hour in Mayagüez so that the witness would know that the watchman was not asleep; that on the night of the fire in Ponce, Eleno Torres called him after twelve or one o'clock a. m., but he does not remember when was the last call before he received notice of the fire, but he called every half hour; that he informed him of the fire on the telephone; that Eleno Torres made his calls through the whole night, because he knew that if he did not the witness could discharge him on the next day; that in the month of August after 9 p. m. there were no more trains in Ponce until the next morning.

Angel Rivera, an employee of the defendant as freight agent in Ponce, testified that between the warehouse and the station there are seven tracks; that he was informed of the fire about 2:30 a. m. while at his house some eight hundred meters distant from the station; that on that night he was not at the station because it was not the cane-grinding season; that upon hearing of the fire he immediately went to the station and saw the fire, and found some firemen and employees that were at a distance coupling a locomotive to a train of cars, and behind there was a train loaded with pe-

troleum; that he helped to take away the petroleum train in which there was a car loaded with gasoline, as he desired to take away the dangerous cargo and then attend to the other tracks; that three cars were entirely burned and two others were partially burned, the first three being near the doors of the warehouse; that the firemen had the hose over the cars, throwing water; that it took him to go from his house to the place of the fire some ten minutes or more; that his wife called him when the firemen passed by; that all of the locomotive crews and some conductors sleep in a house near the warehouse and they were there on that night; that there were two night watchmen, one at the machine shop and the other at the station; that in order for a locomotive to come from the machine shops it first has to go in the direction of Tallaboa to enter the switch; that when he arrived the warehouse was still standing, but was all on fire; that the walls of the warehouse fell on the cars and three of them caught fire; that in one of them there was a motorcycle and he thinks the heat exploded the gasoline and the fire then increased; that there were seven tracks, the petroleum train being on the fifth track, and the train on the sixth was also taken away; that he arrived when the locomotive crews were working to take away the petroleum train.

Antonio Vázquez, a laborer employed in the railroad warehouse, the foreman being Octavio Wys and his assistant Marín, testified that on the day of the fire he worked until 5:30 p. m. and afterwards closed all the doors of the warehouse, there remaining open the door having the lock, which is closed by the foreman of the warehouse who afterwards hands the key to the station agent; that when the witness closed the doors there was no smell of burning matter; that the warehouse was half full, the cargo consisting of hardware and of three cases which were in transit.

Ernesto Gelabert testified that he was the station agent and lived five minutes distant from it because the station

was being painted and he could not then live there with his family; that the foreman of the warehouse, Wys, closed the warehouse and took the key to him, which the witness kept until the following day; that he had knowledge of the fire when it was almost totally extinguished; that on that afternoon Wys gave him the key; that the witness left the station for his house at 10 p. m. and nothing abnormal was happening in the warehouse; that he examined everything before he went away; that when he was given the key to the warehouse he did not always examine the doors to see if they were closed; and that afternoon he did not, for he came around sometimes, but not always.

Modesto Rosa, the night-watchman of the locomotives at the Ponce station, testified that he knew of the fire when the station watchman told him; that on that night there were three locomotives in the house under steam; that he immediately prepared a locomotive which came out fifteen or twenty minutes thereafter, because as it had fifty pounds of pressure they immediately went to get the cars on the tracks; that the first thing they did was to take the coaches and some petroleum drums and place them on the main line; that the watchman changed the switches for coming and going and the witness and the engineer operated the locomotive; that he worked continuously, leaving one track and entering another; that the three were alone, but some people came after they had taken the drums and coaches away; that when the locomotives are delivered to him they are fired and the pressure is maintained at fifty or sixty kilograms, and when it is necessary to go out the fire is spread immediately and it takes some fifteen minutes to raise steam, but they can come out with fifty kilograms.

Juan Betancourt is an engineer for the defendant and was in Ponce on the night of the fire, sleeping in the house which the company has for them forty meters distant from the warehouse. He testified that he heard three revolver

shots; that he got up and opened the door and immediately the flame was upon him, because the fire was very near; that then he yelled to the other men who were sleeping to get up and went running to the roundhouse so as to be able to save the cars which were on the tracks; that he found the reserve locomotive, which is the one used for yard work, and two others; that upon arriving at the roundhouse he found the night watchman preparing a locomotive; that when the work is finished in the afternoon they leave fire in the locomotives so that they may be ready at any moment if needed, the locomotives being left with 150 or 175 pounds pressure so that in the morning they may have 50, 75 or 100 pounds; that during the night the locomotives are left with fire and in the morning they must have steam; that when he ran to the place the watchman went ahead of him and told him to prepare the switches so as to take out the passenger train and some cars loaded with petroleum; that they took the coaches and the cars behind the shop and came back to take away those which were on fire, which they moved 15 or 20 meters where the fire hose could reach them; that when he arrived the locomotive had 75 pounds pressure and 25 pounds is sufficient for running, and therefore they started immediately without stopping to raise steam; that when the firemen arrived he had taken away the petroleum cars and the passenger train; that the petroleum cars were on the fourth track in front of the warehouse and the passenger train on the fifth, and the sixth, seventh and eighth tracks were occupied by cars; that when the firemen arrived they immediately began to work, but the cars that were near the warehouse could not be taken away and three or four of them caught fire, but all the others that were in danger were taken away; that when the firemen arrived the cars were beginning to burn; that he did not take those cars towards Guayama because he could not pass under the fire and because there was nowhere to take them or anything with which to

put out the fire; that there were only the hose that the firemen carried; that he acted for himself until the firemen arrived, but then they took charge; that when the firemen arrived there was a locomotive available; that in order to get to the place where the cars were burning it was first necessary to take away all the cars on the other side.

From all this evidence it appears that although the appellant took some precautions for the protection of the merchandise delivered to it for transportation, and for giving aid with its locomotives in case of necessity, it has nevertheless been unable to prove the original cause of the fire which took place in its warehouse, where there was some merchandise, and which afterwards was communicated to the cars loaded with merchandise belonging to the appellees; therefore, in accordance with the principles of law which we have cited and discussed, we can not hold that the appellant proved a fortuitous event or *vis major* which would exempt it from liability in these cases, or, consequently, that the lower court erred, under the evidence, in adjudging that it shall pay the amounts specified in the respective judgments.

The judgments appealed from must be

*Affirmed.*

Justices Wolf, del Toro and Hutchison concurred.
Mr. Chief Justice Hernández dissented.

DISSENTING OPINION OF MR. CHIEF JUSTICE HERNÁNDEZ.

This is an action to recover from a carrier under a contract of transportation for failure to deliver the goods to the owners as a result of their destruction by a fire which burned the railroad cars in which the goods were carried.

The fire did not *originate* in the cars, but in a warehouse of the carrier, from which it was communicated to the cars. The fire was not an accident of transportation, but was the result of the burning of the warehouse; therefore the liability

of the carrier is not principal, but accessory to the liability attaching to the person responsible for the fire in the warehouse through fault or negligence.   Such liability is not governed by the provisions of the Code of Commerce or of the Police Law of Railroads and its regulations, assuming that the said law and regulations are in force, but by the common law, that is, the provisions of the Civil Code applicable to the case.   The fault or negligence is not to be proved by the carrier, but by the persons suing for damages, as required by the general rules of substantive and adjective law imposing upon the plaintiff the burden of proving his action.

Article 139 of the Regulations for the Application of the Police Law of Railroads, providing that a fire shall not be considered a case of *vis major* unless the carrier proves that it was not due to the negligence or carelessness of his employees or to the insufficiency or bad condition of the means of transportation, if applicable would constitute an exception to the general rule stated and would have to be construed strictly, being applicable only when the fire had originated in the cars in which the merchandise was transported and not when the fire originated in a warehouse and was communicated to the cars.

The judgment of the Supreme Court of Spain of October 7, 1899, is not applicable to the case at bar, for it refers to a fire originating in a car of the carrier and not in another place apart.

And it is to be noticed that article 361 of the Code of Commerce refers only to the loss or damage suffered by the goods *in transportation.*

For the foregoing reasons I dissent from the majority opinion of the court and am of the opinion that the judgments appealed from should be reversed.